UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| ARLINTHIA WHITE, as Personal Representative of the Estate of Derrick Ford, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | CASE NO. 1:05-CV-382 |
| v. | ) ) | |
| MARK GERARDOT, in his Individual Capacity, | ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

### I. INTRODUCTION

Fort Wayne Police Detective Mark Gerardot shot and killed Derrick Ford on January 10, 2004, after a fight broke out outside Veterans of Foreign Wars Post 8147 ("VFW") in Fort Wayne, Indiana. (Docket # 1.) Ford's mother, Arlinthia White, in her capacity as the personal representative of Ford's estate, is suing Gerardot under 42 U.S.C. § 1983, claiming that he used excessive force in violation of Ford's Fourth and Fourteenth Amendment rights.[1] (Docket # 1.) The issue to be tried at the November 12, 2008, jury trial is whether Gerardot used excessive force when he shot and killed Ford or whether his actions were objectively reasonable based upon the facts and circumstances known to him at the time of the shooting.

Gerardot now seeks to exclude the testimony of White's proffered expert witness, David

---

[1] Accordingly, subject matter jurisdiction arises under 28 U.S.C. §§ 1331 and 1343. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

Balash, a firearms examiner and forensic science consultant.[2] (Docket # 127.) For the reasons provided, Gerardot's motion will be GRANTED IN PART and DENIED IN PART.

## II. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 2:30 a.m. on January 10, 2004, Ford and some of his friends left the VFW. (Proposed Pretrial Order 2-5) Somewhat earlier, Gerardot had been dispatched to the area of the VFW after hearing word of a possible gang fight. (*Id.*)

Indeed, a fight broke out outside the VFW and a large crowd gathered; ultimately, shots were fired near the crowd. (*Id.*) Gerardot claims that from his vantage point he saw a black male fire the shots into the crowd. (*Id.*)

White maintains that upon hearing the gunshots, Ford and some friends decided to leave the area and proceeded towards the vehicle that one of them had driven to the VFW. (*Id.*) Gerardot, running through and past the crowd, followed the men (apparently believing Ford was the black male who had fired shots into the crowd) and eventually met up with them as they were about to enter the vehicle. (*Id.*)

Some witnesses state that they heard someone yell, "Freeze!" and that Ford, who had placed his right hand on the front passenger door handle, let go of the handle and turned around with his hands in the air. (*Id.*) Those same witnesses maintain that as Ford was turning with his hands in the air, Gerardot shot him, causing Ford to drop to his knees, where Gerardot shot him several more times. (*Id.*)

In contrast, Gerardot maintains that Ford was actually standing with his back towards

---

[2] Gerardot also moved to bar the testimony of two of White's other expert witnesses, Kenneth Katsaris and Werner Spitz. (Docket # 123.) This motion will be addressed by the Court in separate order.

2

him, concealing both hands in front of his body near his waistband. (*Id*.) Gerardot claims that although he continuously ordered Ford to "show me your hands," Ford did not comply and instead made furtive hand movements, causing Gerardot to think that Ford was either fixing a gun jam or reloading. (*Id*.) After purportedly looking over his shoulder and making eye contact with Gerardot in what Gerardot believed was an attempt to "check" his position, Ford started to turn towards Gerardot with his hands at his mid-section. (*Id*.) Thinking he saw a gun in Ford's hand, Gerardot fired and killed Ford. (*Id*.) If Ford actually had a gun, it was never found. (*Id*.)

In a written report dated February 14, 2007 (the "Report"), one of White's experts, David Balash, a purported firearms examiner and forensic science consultant, criticized Gerardot's version of the events and Fort Wayne Police Department's ("FWPD") investigation into the shooting. (Def.'s Mot. to Exclude Ex. A.) Specifically, Balash articulated the following opinions and conclusions in his Report:

> The investigation by the Fort Wayne Police Department appeared to the undersigned to be pre-ordained as to the outcome rather than a search for how the event transpired. Clearly had the investigators compared the evidence or lack of evidence at the scene along with the clothing and wounds sustained by Derrick Ford to the version of the shooting event as offered by Officer Gerardot, questions should have been raised. There is no visual or physical evidence to support the conclusion that if multiple shots were fired into the crowd, Derrick Ford was the person firing those shots, other than Officer Gerardot's identification.
>
> After a careful review of the evidence or lack of evidence, examining the involved weapon and the clothing of the victim, this examiner is of the opinion that the shooting could not have happened in the manner as described by Officer Gerardot. There is no physical evidence whatsoever to support the contention that 10 to 24 shots were fired by anyone prior to Officer Gerardot's shooting of Mr. Derrick Ford or that Mr. Ford was that shooter, therefore in the opinion of the undersigned, the shooting of Derrick Ford cannot be considered justified.

(Report 5-6.)

Now, in the instant motion, Gerardot seeks to exclude Balash's testimony and the

3

Report, asserting that Balash's opinions are speculative and irrelevant. (Def.'s Mem. of Law in Supp. of Mot. to Exclude David Balash's Ops. ("Def.'s Mem. of Law") 2-10.) Gerardot also maintains that Balash is not qualified to render certain opinions, and that some of Balash's opinions were not disclosed in the Report and thus are inadmissible. (*Id.*)

In response, White argues that Balash is indeed qualified to render his opinions and that his opinions are supported by scientific data and methodology and thus are not speculative. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Exclude David Balash's Ops. ("Resp. Br.") 1-2.) White further emphasizes that Balash's opinions are extremely relevant to the jury's ultimate determination of whether Gerardot violated Ford's constitutional right to be free from excessive force. (*Id.*)

### III. APPLICABLE LAW

The admissibility of expert evidence is governed by Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Daubert* requires a district court to exercise a "gatekeeping" function to ensure that expert testimony is both reliable and relevant pursuant to Rule 702. *Winters*, 498 F.3d 741; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *see generally Daubert*, 509 U.S.

4

at 589-92; *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006); *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003). This inquiry applies not only to scientific testimony, "but to all kinds of expert testimony." *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002) (noting that Rule 702 "makes no distinction between 'scientific' knowledge and other forms of specialized knowledge" (citing *Kumho Tire*, 526 U.S. at 149)). The fundamental purpose of the gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

According to the Seventh Circuit Court of Appeals, to gauge reliability, "the court is to determine whether the expert is qualified in the relevant field and . . . examine the methodology the expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). "The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence." *Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 921 (N.D. Ind. 2006); *see also Bradley v. Brown*, 852 F. Supp. 690, 698 (N.D. Ind. 1994), *aff'd*, 42 F.3d 434 (7th Cir. 1994).

When determining whether an expert is qualified to render an opinion, the court should consider his "full range of practical experience as well as academic or technical training . . . ." *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (quoting *Smith*, 215 F.3d at 718). Nevertheless, "[a] court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter . . . . [T]he court's gatekeeping function [also] focuses on an examination of the expert's methodology." *Smith*, 215 F.3d at 718; *see also Winters*, 498 F.3d

5

at 742. Accordingly, "[an] expert['s] work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff–deploying neither data nor analysis–is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

Specifically, *Daubert* outlined the following factors to guide district courts in assessing an expert's methodology:

> (1) whether a theory or technique . . . can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique or method has met with general acceptance.

*Conn*, 297 F.3d at 555 (quoting *Daubert*, 509 U.S. at 593-94) (internal quotations omitted); *Winters*, 498 F.3d at 742. "[A]lthough the fundamental task of the trial court remains the same no matter what sort of specialized information is proffered, the *Daubert* factors set forth above ought not be considered a definitive check list suitable for the evaluation of all kinds of evidentiary submissions involving specialized knowledge." *Conn*, 297 F.3d at 555-56. Indeed, this list is "neither definitive nor exhaustive, but rather flexible to account for the various types of potentially appropriate expert testimony." *Deputy*, 345 F.3d at 505. "Using the *Daubert* factors as a point of departure, the district court is free to fashion an approach more precisely tailored to an evaluation of the particular evidentiary submission before it." *Conn*, 297 F.3d at 556.

But even if an expert's testimony is deemed reliable, it must be excluded if it is not relevant, which means under Rule 702 that it is not likely "to assist the trier of fact to understand the evidence or determine a fact in issue . . . ." *United States v. Hall*, 93 F.3d 1337, 1342 (7th

6

Cir. 1996); *see also United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007); *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000); *Smith*, 215 F.3d at 718. Stated another way, "the suggested . . . testimony must 'fit' the issue to which the expert is testifying." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (quoting *Porter v. Whitehall Labs. Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)).

Moreover, when determining whether an expert's testimony is admissible, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (citing *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997)). As the Supreme Court wrote: "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. Stated another way, an expert "who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elec. Corp. v. WH-T Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *see also Mamah*, 332 F.3d at 478 ("The court is not obligated to admit testimony just because it is given by an expert."). Indeed, the Seventh Circuit has consistently held that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zenith Elec. Corp.*, 395 F.3d at 419-20 (collecting cases).

## IV. DISCUSSION

A. <u>Balash's testimony that shell casing no. 7 was not moved</u>

In the "Comments and Observations" section of his Report, Balash states:

Officer Gerardot stated in his deposition that he did not move from his position during the shooting of Derrick Ford.; however the position of fired cartridge case

> #7 clearly indicates that the weapon, based on the ejection pattern from this weapon, was moved from the area where item[s] #1, #2 and #3 were found to an area where #7 could be deposited . . . . It was clear from the photographs to this examiner that these fired cartridge cases did not move from when they were deposited by the firing of Officer Gerardot's weapon. There is no indication of people stepping on or moving these fired cartridge cases from where they are observed in the scene photographs.

(Report 3.) Gerardot asserts that Balash should not be permitted to testify that shell casing no. 7 was not moved from where it originally landed, arguing that this testimony is "based on pure speculation." (Def.'s Mem. of Law 2.) Gerardot further contends that the jury does not need expert testimony to assist them in deciding whether a shell casing was moved, since they can simply look at the same photograph on which Balash based his opinion and arrive at their own conclusion through common sense. (*Id.* at 3.)

Gerardot's arguments go more toward the weight of Balash's testimony, not its admissibility. *See, e.g.*, *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1119-20 (N.D. Ill. 2005) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility."). Balash's knowledge and experience in the field of ballistics and crime scene investigation certainly qualify him to opine about the position of shell casing no. 7, and his testimony is based upon sufficient facts or data, that is, the photographs of the crime scene and his examination of the cartridge, as well as his test firing of Gerardot's weapon and his analysis of the ejection pattern. (Balash Dep. 38-39.) Furthermore, his opinion about shell casing no. 7's ability to move considering its weight, shape, and temperature in certain ground conditions *(see* Balash Dep. 44-45), is likely "to assist the trier of fact to understand the evidence . . . ." *Hall*, 93 F.3d at 1342.

8

Therefore, Gerardot's motion is DENIED with respect to Balash's testimony that shell casing no. 7 was not moved.

B. <u>Balash's Testimony that Gerardot moved when he discharged his firearm based on the shell casing ejection pattern and the location of the four shell casings at the scene</u>

In that same vein, Gerardot contends that Balash's opinion that Gerardot moved when he discharged his firearm, which Balash based upon the shell casing ejection pattern and the location of the four shell casings at the scene, is speculative. (Def.'s Mem. of Law 3.) Gerardot explains that Balash's own testimony and shooting demonstrations show that the shell casing ejection pattern and the final resting place of the shell casings can vary greatly and that the shell casings could have skidded, jumped, or been moved after landing. (*Id*. at 3-5.) Gerardot further asserts that whether his weapon moved is irrelevant in determining the ultimate issue in this case – whether it was reasonable for him to use deadly force. (*Id*.)

Gerardot's argument is unpersuasive. As a ballistics and crime scene expert, Balash is qualified to opine about the resting places of the fired cartridges. Moreover, Balash's testimony is the product of reliable principles and methods, that is, his test firing of Gerardot's weapon and the ejection pattern of the fired cartridge cases, which Balash found to be "very consistent." (Balash Dep. 32-34); *cf. Leong v. City of Detroit*, 151 F. Supp. 2d 858, 870 (E.D. Mich. 2001) (excluding Balash's testimony concerning the location of the police officers where the ejection pattern of the officers' weapons was "random" and "not consistent," and Balash conceded that it was not necessarily safe to assume that the casings were discovered in their initial positions).

Admittedly, Balash was unable to duplicate the exact conditions of the night of the shooting, and he does not know precisely where Gerardot was standing that night nor the angle that Gerardot was holding his gun. (*See* Balash Dep. 42-49.) Yet, these arguments go more

9

toward the weight of Balash's testimony, rather than its admissibility. *See, e.g.*, *Loeffel Steel Prods.*, 372 F. Supp. 2d at 1119-20.

On that same note, we acknowledge that whether Gerardot's weapon moved is not necessarily determinative to the ultimate issue in this case – that is, whether it was reasonable for Gerardot to use deadly force. *See Leong*, 151 F. Supp. 2d at 871. Yet, here Balash's testimony is seemingly relevant toward the jury's task of determining the credibility of Gerardot's version of the events, as Gerardot testified that he did not move while he was shooting. (*See* Balash Dep. 52; *see also* Tr. 54.). Furthermore, as with his testimony with respect to shell casing no. 7 discussed *supra*, Balash's opinion about the shell casings' positions is likely "to assist the trier of fact to understand the evidence . . . ." *Hall*, 93 F.3d at 1342.

Therefore, Gerardot's motion is DENIED with respect to Balash's testimony that Gerardot moved when he discharged his firearm based on the shell casing ejection pattern and the location of the four shell casings at the scene.

C. Balash's testimony criticizing FWPD's investigation of the shooting

Gerardot next contends that Balash should not be permitted to testify about his criticisms of FWPD's investigation into the shooting, stating that he is not qualified to do so and that any testimony concerning the investigation is irrelevant. (Def.'s Mem. of Law. 6.)

Indeed, Balash touts himself as an expert in firearms identification, crime scene reconstruction, and forensic consulting, *not* an expert in police procedure. (Balash Dep. 3.) In fact, White concedes that she intends to rely upon another expert, Katsaris, as a police procedure expert. (Resp. Br. 8.)

Moreover, a post-shooting investigation is simply not relevant to the "circumstances

10

known and information available to the officer at the time of his action (firing the fatal shot)." *Sherrod v. Berry*, 856 F.2d 802, 804-05 (7th Cir. 1988). In fact, "[t]he reception of evidence or any information beyond that which [Gerardot] had and reasonably believed at the time he fired his revolver is improper, irrelevant and prejudicial to the determination of whether [he] acted reasonably 'under the circumstances.'" *Id*. ("When a jury measures the objective reasonableness of an officer's action, it must stand in *his* shoes and judge the reasonableness of his actions based upon the information he possessed and the judgement he exercised in responding to that situation.").

Other district courts have come to the same conclusion with respect to Balash's testimony about post-incident police investigations in excessive force cases. For example, in *Sonnier v. Field*, No. 2:05-cv-14, 2007 WL 576655, at *4 (W.D. Pa. Feb. 21, 2007), the district court stated: "Any errors or omissions by the State Policy in their post-incident investigation could not be attributed to the Defendants. Accordingly, Balash's opinions and testimony on this topic will be inadmissible at trial." *Id*.; *see also McKinney v. Duplain*, No. 1:04-cv-294, Entry for Jan. 10, 2008 (S.D. Ind.) (precluding Balash's opinions about "the inadequacy of the investigation of the incident regarding the Muncie Police Department").

Therefore, Gerardot's motion is GRANTED with respect to Balash's testimony about FWPD's investigation after the shooting, including that (1) the investigation "appeared to . . . be pre-ordained as to the outcome rather than a search for how the event transpired"; (2) that Gerardot's interview on January 15, 2004, "appeared . . . as an opportunity for Officer Gerardot to state his position rather than an information finding interview as to how and why this event transpired"; and (3) that "the right hand, right sleeve of the coat and the victim's face should all

11

have been tested for primer residue compounds." (Report 5.)

D. <u>Balash's testimony regarding Gerardot's handling of a possible armed suspect and proper police procedure in deadly force situations</u>

Gerardot also asserts that Balash is not qualified to testify regarding Gerardot's handling of a possible armed subject and proper police procedure in lethal force situations.

As explained *supra*, Balash's expertise lies not in police procedure in deadly force situations but as a firearms examiner and forensic science consultant. Balash has not worked as a patrol officer on the streets for thirty-seven years, and the last time he had any training as a police officer was in 1992. (Balash Dep. 7-8.) He has not undergone any training as a police officer handling a possible armed suspect or training in lethal force situation since 1991, more than seventeen years ago. (Balash Dep. 9.) As articulated *supra*, White admits that she intends to rely upon Katsaris as a police procedure expert, *not* Balash. (Resp. Br. 8.)

Thus, Balash is not qualified to testify about proper police procedure in handling an armed suspect and lethal force situations, and Gerardot's motion to exclude any statements by Balash to that effect is GRANTED, including his statement that "[t]he only reasons . . . to focus solely on center mass is that you have already made the decision to fire REGARDLESS of any actions by the individual." (Report 4.)

E. <u>Balash's testimony that he believes Ford was shot and then began to turn</u>

In his deposition, Balash stated that he thinks Ford "was shot and then began to turn" and that Ford had his back towards Gerardot when the first shot hit him. (Balash Dep. 69-70, 114.) Gerardot argues that these opinions should be excluded because they were not disclosed in Balash's Report in accordance with Federal Rule of Civil Procedure 26. He also advances a cursory argument that Balash is not qualified to render this opinion and that the opinion is

12

speculative, though he fails to pursue this argument in his reply. (Def.'s Mem. of Law. 8-9; Def.'s Reply in Supp. of Def.'s Mot. to Exclude David Balash's Ops. 4.)

Indeed, Rule 26 states that an expert's report "shall contain a complete statement of all opinions the witness will express and the basis and reasons for them; [and] the data or other information considered by the witness in forming them . . . ." Fed. R. Civ. P. 26. Under Federal Rule of Civil Procedure 37(c)(1), if the evidence was not disclosed in accordance with Rule 26, the exclusion of such evidence is automatic and mandatory, unless the failure to disclose "was substantially justified or is harmless."

Admittedly, Balash's testimony at his deposition that he thinks Ford "was shot and then began to turn" may exceed the scope of his Report, since he did not articulate this particular opinion in his Report. Therefore, Gerardot's counsel was likely unable to properly cross-examine Balash at his deposition because these conclusions were presented for the first time. *See Baethke v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 97 C 7882, 1999 WL 1144917, at *4 (N.D. Ill. Dec. 9, 1999). It would therefore be unfair to introduce at trial deposition testimony about matters not discussed or reasonably within the scope of his written report. *Id*.

Nonetheless, Gerardot's attorney deposed Balash on May 28, 2008, and has had since then to study Balash's conclusions, re-notice his deposition, and even consult an expert of its own. *Id*. ("The purpose of expert reports is to inform the adverse party of all opinions to be expressed at trial and their underlying support so it can thoroughly assess the nature and the scope of the expert opinion in preparation for trial; this process eliminates unfair surprise and preserves resources of the parties and the court."). Thus, Gerardot has had available for several months all of the required information in a combination of Balash's written report and deposition

testimony, that is, his conclusions, their bases, and the exhibits relied upon; yet, Gerardot has never suggested that he needed to re-depose Balash. *Id*. Consequently, he "cannot with a straight face claim unfair surprise or prejudice due to [White's] failure to comply with Rule 26." *Id*.

Furthermore, Balash testified at length in his deposition about the facts and methodology that he relied upon to reach this opinion, explaining that it is based upon data such as the location of Ford's wounds, the description of his position, and the location of his body. (Balash Dep. 67-90, 114-15.) In fact, Balash has testified about a deceased's position when he was shot based on such data in at least one other excessive force case. *See McKinney v. Duplain*, 1:04-cv-294, 2007 WL 1128852, at *4-5 (S.D. Ind. Apr. 16, 2007); *see also Leong*, 151 F. Supp. 2d at 869 n.7. Thus, Gerardot's conclusory assertion that Balash's opinion is "speculative" is unconvincing.

In sum, Gerardot's motion is GRANTED IN PART in that White may not admit through deposition testimony Balash's opinion that Ford "was shot and then began to turn." However, Gerardot's motion is also DENIED IN PART in that Balash may testify at trial to the conclusions he explained in his deposition because Gerardot has since had ample time and notice to prepare for cross-examination. *Id*.

F. Balash's testimony that "the shooting of Derrick Ford cannot be justified"

Gerardot further contends that Balash should not be permitted to testify that "the shooting of Derrick Ford cannot be justified" since this testimony constitutes a legal conclusion. (Def.'s Mem. of Law 9.)

Gerardot's argument has merit. In *Miller v. City of Columbus*, No. 2:05-cv-425, 2007 WL 1114238, at *3 (S.D. Ohio Apr. 12, 2007), another excessive force case, the district court held:

14

> Mr. Balash will not be permitted to testify as to whether Defendant Beard's use of
> force was unreasonable, as this matter is not within his area of expertise as a
> firearms examiner and forensic science consultant and on the further ground that
> this is a conclusion that must ultimately be made by the jury in this case.

*See also McKinney*, No. 1:04-cv-294, Entry for Jan. 10, 2008 (precluding Balash's "comments on the ultimate legal issue (such as 'I fail to see the life threatening felony required to employ the use of lethal or fatal force.')"). Similarly, in *Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006), the Seventh Circuit Court of Appeals affirmed the district court's decision to exclude the plaintiff's experts from testifying that the defendant police officer used excessive force. The Seventh Circuit articulated:

> The jury, after having heard all of the evidence presented, was in as good a
> position as the experts to judge whether the force used by the officers to subdue
> Thompson was objectively reasonable given the circumstances in this case.
> Introducing two experts to testify that Officer Hespe used excessive force would
> have induced the jurors to substitute their own independent conclusions for that of
> the experts. In other words, they would have been "induced to decide the case on
> an improper basis . . . rather than on the evidence presented . . .," which is
> precisely why the evidence should have been excluded.

*Id.* at 458 (citation omitted).

In that same vein, Gerardot's motion is GRANTED with respect to Balash's testimony that "the shooting of Derrick Ford cannot be justified."

G. <u>Balash's testimony that "the shooting could not have happened in the manner as described by Officer Gerardot"</u>

Gerardot next asserts that Balash should not be permitted to testify that "the shooting could not have happened in the manner as described by Officer Gerardot," arguing that this testimony is essentially testimony regarding Gerardot's credibility." (Def.'s Mem. of Law 10.)

The Court agrees. "While Balash is free to explain the conclusions he draws from the crime scene evidence, he may not opine as to whether or not he believes that the officer['s] prior

15

statements and/or testimony is credible. Such testimony would exceed Balash's expertise and would invade the province of the jury." *Sonnier*, 2007 WL 576655, at *4; *see also Richman v. Sheahan*, 415 F. Supp. 2d 929, 941-44 (N.D. Ill. 2006). Moreover, White does not address this objection in her response and thus apparently does not contest Gerardot's request to preclude this testimony. *See generally Doe By & Through G.S. v. Johnson*, 52 F.3d 1448, 1457 (7th Cir. 1995) ("[A] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point." (citation and internal quotations marks omitted)).

Therefore, Gerardot's motion is GRANTED with respect to Balash's testimony that "the shooting could not have happened in the manner as described by Officer Gerardot."

H. Balash's testimony whether Ford's hands were in the air

Finally, Gerardot argues that Balash should be precluded from testifying whether Ford's hands were in the air at the time he was shot by Gerardot, asserting that Balash expressed no opinion regarding this issue in his Report or in his deposition.[3]

White did not address this objection in her response, and thus apparently does not contest Gerardot's request to preclude this testimony. *See generally id*. Therefore, Gerardot's motion is GRANTED with respect to any testimony from Balash concerning whether Ford's hands were in the air.

---

[3] At his deposition, Balash testified:

Q. Do you know of any forensic evidence that supports the position that Derrick Ford had his hands in the air, and I'm not talking about his head – above his head, but at shoulder level at the time he was shot the first time?

A. I can't say that they were, nor that they were not.

(Balash Dep. 80.)

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Exclude David Balash's Opinions (Docket # 127) is GRANTED IN PART and DENIED IN PART according to the terms set forth in this Opinion and Order.

SO ORDERED.

Enter for the 10th day of September, 2008.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge
