# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **ARLINTHIA WHITE, as Personal Representative of the Estate of Derrick Ford, Deceased,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **CASE NO. 1:05-CV-382** |
| **v.** | ) ) ) | |
| **MARK GERARDOT, in his Individual Capacity,** | ) ) ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

## I. INTRODUCTION

Fort Wayne Police Detective Mark Gerardot shot and killed Derrick Ford on January 10, 2004, after a fight broke out outside Veterans of Foreign Wars Post 8147 ("VFW") in Fort Wayne, Indiana. (Docket # 1.) Ford's mother, Arlinthia White, in her capacity as the personal representative of Ford's estate, is suing Gerardot under 42 U.S.C. § 1983, claiming that he used excessive force in violation of Ford's Fourth and Fourteenth Amendment rights.[1] (Docket # 1.) The issue to be tried at the November 12, 2008, jury trial is whether Gerardot used excessive force when he shot and killed Ford or whether his actions were objectively reasonable based upon the facts and circumstances known to him at the time of the shooting.

Gerardot now seeks to exclude the testimony of two of White's proffered expert witnesses, Kenneth Katsaris, a law enforcement procedure expert, and Werner Spitz, a forensic

---

[1] Accordingly, subject matter jurisdiction arises under 28 U.S.C. §§ 1331 and 1343. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

pathologist.[2] (Docket # 123.)  For the reasons provided, Gerardot's motion will be GRANTED

IN PART and DENIED IN PART with respect to Katsaris, but DENIED as to Spitz.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

At approximately 2:30 a.m. on January 10, 2004, Ford and some of his friends left the

VFW. (Proposed Pretrial Order 2-5.)  Somewhat earlier, Gerardot had been dispatched to the

area of the VFW after hearing word of a possible gang fight. (*Id.*)

Indeed, a fight broke out outside the VFW and a large crowd gathered; ultimately, shots

were fired near the crowd. (*Id.*)  Gerardot claims that from his vantage point he saw a black male

fire the shots into the crowd. (*Id.*)

White maintains that upon hearing the gunshots, Ford and some friends decided to leave

the area and proceeded towards the vehicle that one of them had driven to the VFW. (*Id.*)

Gerardot, running through and past the crowd, followed the men (apparently believing Ford was

the black male who had fired shots into the crowd) and eventually met up with them as they were

about to enter the vehicle. (*Id.*)

Some witnesses state that they heard someone yell, "Freeze!" and that Ford, who had

placed his right hand on the front passenger door handle, let go of the handle and turned around

with his hands in the air. (*Id.*)  Those same witnesses maintain that as Ford was turning with his

---

[2]  White filed a response to Gerardot's motion on August 9, 2008 (Docket # 136), and Gerardot replied on August 26, 2008 (Docket # 143).  The Court then ordered further briefing concerning Katsaris in particular (Docket # 141) because it believed that if Gerardot's motion was viewed as a motion *in limine*, which the Court intended to do, the interface between Federal Rules of Evidence 702 and 403 might have some particular bite. *See Thompson v. City of Chicago*, 472 F.3d 444, 457-58 (7th Cir. 2006).  As a result, on September 3, 2008, White filed a sur-response concerning Gerardot's motion to exclude Katsaris. (Docket # 145.)

Also, Gerardot moved to bar the testimony of White's two other expert witnesses, David Balash and Nitin Paranjpe (Docket # 125, 127, 130), which the Court addressed in two separate orders entered on September 10, 2008 (Docket # 151, 153).

hands in the air, Gerardot shot him, causing Ford to drop to his knees, where Gerardot shot him several more times. (*Id.*)

In contrast, Gerardot maintains that Ford was actually standing with his back towards him, concealing both hands in front of his body near his waistband. (*Id.*) Gerardot claims that although he continuously ordered Ford to "show me your hands," Ford did not comply and instead made furtive hand movements, causing Gerardot to think that Ford was either fixing a gun jam or reloading. (*Id.*) After purportedly looking over his shoulder and making eye contact with Gerardot in what Gerardot believed was an attempt to "check" his position, Ford started to turn towards Gerardot with his hands at his mid-section. (*Id.*) Thinking he saw a gun in Ford's hand, Gerardot fired and killed Ford. (*Id.*) If Ford actually had a gun, it was never found. (*Id.*)

One of White's experts, Kenneth Katsaris, an expert in law enforcement procedure, criticized Gerardot's version of the events, opining that Gerardot should not have concluded that Ford was the individual who fired shots into the crowd and that Gerardot's conduct was objectively unreasonable under the circumstances presented. (Katsaris Aff. 3-7.) In addition, Katsaris criticized Fort Wayne Police Department's ("FWPD") investigation into the shooting, as well as certain of Gerardot's actions before the shooting that he believes may have prevented it from ever happening.[3] (Katsaris Aff. 3-7.) Katsaris reached these opinions based on his

---

[3] More particularly, Katsaris opines that Gerardot (1) failed to properly evaluate the chaotic situation before applying deadly force towards Ford; (2) failed to specifically identify anyone, including the person he observed shooting into the crowd and who he later thought was Ford; (3) instead of chasing the shooter, should have followed recognized police training and standards by first determining whether anyone was injured and needed medical attention as a result of thee shots fired into the crowd; (4) by running into the crowd, briefly lost sight of the shooter, and it was only after clearing the crowd that he saw someone, Ford, who only generically fit the description of the shooter, offering little basis to believe that Ford was either armed or the shooter; (5) fell below the recognized standard of care of a police officer in deciding to shoot at Ford because not only should he never have put himself in the position to confront Ford, but he shot Ford in the back when it was unclear whether Ford even had a gun and Ford was, in fact, raising (or had already raised) his hands as instructed; and (6) also fell below a recognized standard of care for proper police crowd control because he could have prevented the initial fight at the VFW by

education, training, and experience, after reviewing the autopsy report, FWPD's report and its policies, and a plethora of discovery material, including photographs, witnesses' depositions and statements, and various laboratory and investigative reports. (Katsaris Aff. 2-3.)

The opinion of another of White's experts, Werner Spitz, a forensic pathologist, also challenges Gerardot's version of the events. According to Spitz, Ford had his hands raised in the air at the time of the shooting, was falling when he was shot, was not holding a gun, and "experienced conscious pain and suffering and the fear of impending doom" before he died. (Spitz Aff. ¶¶ 5 -7; Letter from Spitz to Robert Giroux (Feb. 12, 2007) ("Spitz Letter") at 2.) He offers these conclusions to a "reasonable medical certainty" based upon his education, training, and experience, after his review of the coroner's report, a postmortem examination conducted by Northeast Indiana Forensic Center, some police reports, and Gerardot's deposition. (Spitz Aff. ¶ 8; Spitz Letter at 1-2.)

Now, in the instant motion, Gerardot seeks to exclude the opinions of Katsaris and Spitz in their entirety. As to Katsaris, Gerardot does not challenge his qualifications to testify generally as police procedure expert. Rather, Gerardot contends that two of Katsaris's opinions – that is, that Gerardot should not have concluded that Ford was the individual who fired shots into the crowd and that Gerardot's conduct was objectively unreasonable under the circumstances presented – are impermissible legal conclusions and will not assist the jury. (Mot. to Exclude Ops. of Kenneth Katsaris and Werner Spitz, M.D. 1-2.) In addition, Gerardot asserts that the remainder of Katsaris's opinions on proper police procedure and the post-shooting investigations are not relevant to the individual capacity claim against Gerardot. (Mot. to

---

simply turning on his squad car lights, which would have exhibited a police presence. (Katsaris Aff. 3-7.)

Exclude 2.)  As to Spitz, Gerardot contends that all of his opinions are not based upon any reasonable degree of medical or scientific certainty and thus are speculative. (Mot. to Exclude 2.)

Of course, White opposes Gerardot's motion, arguing that Katsaris and Spitz are indeed qualified to render their opinions and that their opinions are based upon sufficient data and methodology. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Exclude Ops. of Kenneth Katsaris and Werner Spitz, M.D. ("Resp. Br.") at 1-2.)  White further emphasizes that these opinions are relevant to the jury's ultimate determination of whether Gerardot violated Ford's constitutional right to be free from excessive force. (Resp. Br. 2.)

## III.  APPLICABLE LAW

The admissibility of expert evidence is governed by Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007).  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Daubert* requires a district court to exercise a "gatekeeping" function to ensure that expert testimony is both reliable and relevant pursuant to Rule 702. *Winters*, 498 F.3d 741; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *see generally Daubert*, 509 U.S. at 589-92; *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006); *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003).  This inquiry applies not only to scientific testimony, "but to all kinds of expert testimony." *United States v. Conn*, 297 F.3d 548, 555 (7th

Cir. 2002) (noting that Rule 702 "makes no distinction between 'scientific' knowledge and other forms of specialized knowledge" (citing *Kumho Tire*, 526 U.S. at 149)). The fundamental purpose of the gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

According to the Seventh Circuit Court of Appeals, to gauge reliability, "the court is to determine whether the expert is qualified in the relevant field and . . . examine the methodology the expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). "The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence." *Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 921 (N.D. Ind. 2006); *see also Bradley v. Brown*, 852 F. Supp. 690, 698 (N.D. Ind. 1994), *aff'd*, 42 F.3d 434 (7th Cir. 1994).

When determining whether an expert is qualified to render an opinion, the court should consider his "full range of practical experience as well as academic or technical training . . . ." *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (quoting *Smith*, 215 F.3d at 718). Nevertheless, "[a] court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter . . . . [T]he court's gatekeeping function [also] focuses on an examination of the expert's methodology." *Smith*, 215 F.3d at 718; *see also Winters*, 498 F.3d at 742. Accordingly, "[an] expert['s] work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff–deploying neither data nor analysis–is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d

919, 924 (7th Cir. 2000).

Specifically, *Daubert* outlined the following factors to guide district courts in assessing

an expert's methodology:

> (1) whether a theory or technique . . . can be (and has been) tested; (2) whether
> the theory or technique has been subjected to peer review and publication; (3) the
> known or potential rate of error; (4) the existence and maintenance of standards
> controlling the technique's operation; and (5) whether the technique or method
> has met with general acceptance.

*Conn*, 297 F.3d at 555 (quoting *Daubert*, 509 U.S. at 593-94) (internal quotations omitted);

*Winters*, 498 F.3d at 742. "[A]lthough the fundamental task of the trial court remains the same

no matter what sort of specialized information is proffered, the *Daubert* factors set forth above

ought not be considered a definitive check list suitable for the evaluation of all kinds of

evidentiary submissions involving specialized knowledge." *Conn*, 297 F.3d at 555-56. Indeed,

this list is "neither definitive nor exhaustive, but rather flexible to account for the various types

of potentially appropriate expert testimony." *Deputy*, 345 F.3d at 505. "Using the *Daubert*

factors as a point of departure, the district court is free to fashion an approach more precisely

tailored to an evaluation of the particular evidentiary submission before it." *Conn*, 297 F.3d at

556.

But even if an expert's testimony is deemed reliable, it must be excluded if it is not

relevant, which means under Rule 702 that it is not likely "to assist the trier of fact to understand

the evidence or determine a fact in issue . . . ." *United States v. Hall*, 93 F.3d 1337, 1342 (7th

Cir. 1996); *see also United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007); *Walker v. Soo

Line R.R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000); *Smith*, 215 F.3d at 718. Stated another way,

"the suggested . . . testimony must 'fit' the issue to which the expert is testifying." *Chapman v.*

*Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (quoting *Porter v. Whitehall Labs. Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)).

Moreover, when determining whether an expert's testimony is admissible, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (citing *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997)). As the Supreme Court wrote: "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. Stated another way, an expert "who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elec. Corp. v. WH-T Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *see also Mamah*, 332 F.3d at 478 ("The court is not obligated to admit testimony just because it is given by an expert."). Indeed, the Seventh Circuit has consistently held that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zenith Elec. Corp.*, 395 F.3d at 419-20 (collecting cases).

## IV. DISCUSSION

A. <u>Katsaris's opinion that Gerardot should not have concluded that Ford was the individual who fired shots into the crowd</u>

Katsaris opines that Gerardot should not have concluded that Ford was the individual who fired shots in the crowd:

> I do not believe that [Gerardot] objectively, reasonably should have believed that Derrick Ford was the shooter, given the limited amount of both information that he had about him, the fact that his dress that he describes appears to be replicated by others, the fact that he never saw his face, the fact that he lost sight of them, and the fact that even when they were approaching the car, he wasn't sure where

they came from, and that was very carefully indicated by him. He only saw them the few steps as they moved toward the car and not beforehand.

(Katsaris Dep. 55-56.) Gerardot claims that this opinion should be excluded because it is "an impermissible legal conclusion and invades the province of the jury." (Mem. of Law in Supp. of Mot. to Exclude Ops. of Kenneth Katsaris and Werner Spitz, M.D. 6-7.)

"[E]xpert testimony on police practices and the use of force is, generally, admissible in a § 1983 excessive force case." *McCloughan v. City of Springfield*, 208 F.R.D. 236, 239 (C.D. Ill. 2002) (citing *Calusinski v. Kruger*, 24 F.3d 931, 937 (7th Cir. 1994); *Kladis v. Brezek*, 823 F.2d 1014, 1019 (7th Cir. 1987)). Here, there is no dispute that Katsaris has extensive academic and practical experience with law enforcement practices and is qualified to testify on these matters. Likewise, there is little doubt that Katsaris's testimony about proper police procedure and the use of force under the circumstances Gerardot encountered the night of the shooting would assist the jury in determining whether Gerardot's actions were objectively reasonable. *See id.*; *see also Bates v. King County*, No. C05-1348RSM, 2007 WL 1412889, at *3 (W.D. Wash. May 9, 2007) ("The appropriate response by a police officer to a person resisting arrest is not necessarily common knowledge.").

However, "Seventh Circuit precedent . . . prohibits expert witnesses from offering opinions or legal conclusions on issues that will determine the outcome of a case." *Klaczak v. Consol. Med. Transp. Inc.*, No. 96 C 6502, 2005 WL 1564981, at *3 (N.D. Ill. May 26, 2005) (collecting cases). Here, Katsaris's opinion that Gerardot should not have concluded that Ford was the individual who fired shots into the crowd goes too far, as it improperly intrudes upon the province of the jury. After hearing all of the evidence, the jury will be in as good or better position than Katsaris to determine whether Gerardot had a sufficient factual basis to reasonably

believe that Ford was the shooter and that he was the same individual he pursued from the onset of his pursuit. *See id.* at *2 (determining that expert testimony was not helpful to the jury because "the jury is well positioned to make [an] . . . assessment in the absence of a battle of expert testimony about what parties knew or did not know . . . ."); *see also Thompson*, 472 F.3d at 458.

Furthermore, many of the crucial facts in this case are in dispute. If the Court were to allow Katsaris to offer his opinion as to whether Gerardot, in fact, *followed* proper police procedure, "the Court, in essence, would be allowing Katsaris to, as an expert, make and relay credibility findings to the jury regarding the witnesses' testimony. Such testimony is improper . . . ." *McCloughan*, 208 F.R.D. at 239. "While [an expert] is free to explain the conclusions he draws from the . . . evidence, he may not opine as to whether or not he believes that the officer['s] prior statements and/or testimony is credible. Such testimony would exceed [the expert's] expertise and would invade the province of the jury." *Sonnier v. Field*, No. 2:05-cv-14, 2007 WL 576655, at *4 (Feb. 21, 2007); *see also Richman v. Sheahan*, 415 F. Supp. 2d 929, 941-44 (N.D. Ill. 2006).

Moreover, when applying the Federal Rule of Evidence 403 balancing test, it is clear that the probative value of Katsaris's opinion that Gerardot should not have concluded that Ford was the shooter is substantially outweighed by the danger of unfair prejudice to Gerardot. The jury may too easily confuse Katsaris's opinion on this point with its ultimate assignment of determining whether Gerardot's conduct was reasonable under the circumstances. *See Thompson*, 472 F.3d at 456-57.

Therefore, Gerardot's motion to exclude Katsaris's opinion that Gerardot should not have

concluded that Ford was the individual who fired shots into the crowd is GRANTED; Katsaris

may, however, testify about the proper police procedure to be employed under the circumstances

facing Gerardot on the night of the shooting.

B.  Katsaris's opinion that Gerardot's conduct was objectively unreasonable and excessive under the circumstances presented

Similarly, Gerardot contends that Katsaris's opinion that Gerardot's conduct was

"objectively unreasonable and excessive force" under the circumstances presented should be

excluded. (*See* Katsarsis Aff. 3.)  He contends that "it is nothing more than his personal opinion

and represents an inadmissible legal opinion." (Mem. of Law 7.)

Indeed, the ultimate issue that the jury will be called upon to decide in this case is

whether Gerardot used unreasonable deadly force against Ford. *See Graham v. Connor*, 490 U.S.

386 (1989); *Tennessee v. Garner*, 471 U.S. 1 (1985); *see also* Federal Civil Jury Instructions of

the Seventh Circuit No. 7.08.  This inquiry centers on whether the officer's actions were

"'objectively reasonable' in light of the facts and circumstances confronting [him]." *Graham*,

490 U.S. at 387.

The Seventh Circuit Court of Appeals has excluded expert testimony on issues that are

ultimately the province of the jury.  For example, in *Thompson v. City of Chicago*, 472 F.3d 444

(7th Cir. 2006), the Seventh Circuit affirmed the district court's decision to exclude the

plaintiff's experts from testifying that the defendant police officer used excessive force,

articulating:

> The jury, after having heard all of the evidence presented, was in as good a
> position as the experts to judge whether the force used by the officers to subdue
> Thompson was objectively reasonable given the circumstances in this case.
> Introducing two experts to testify that Officer Hespe used excessive force would
> have induced the jurors to substitute their own independent conclusions for that of

the experts. In other words, they would have been "induced to decide the case on an improper basis . . . rather than on the evidence presented . . .," which is precisely why the evidence should have been excluded.

*Id.* at 458 (citation omitted). In fact, at least two other district courts have concluded that Katsaris's opinion that a defendant law enforcement officer used "unreasonable" or "unnecessary" force was an impermissible legal conclusion and thus excluded it. *See Norman v. City of Lorain, Ohio*, 1:04-cv-913, 2006 WL 5249725, at *2-3 (N.D. Ohio Nov. 27, 2006); *McCloughan*, 208 F.R.D. at 239-40.

Considering the foregoing precedent, Gerardot's motion to exclude Katsaris's opinion that Gerardot's conduct was objectively unreasonable and excessive under the circumstances presented is GRANTED.

C. Katsaris's opinions on proper police procedure and the post-shooting investigation

Katsaris also offers a number of other criticisms concerning the actions of Gerardot and FWPD both before and after the shooting. For example, Katsaris opines that Gerardot failed to take certain actions before the shooting – including calling for backup, turning on police lights, and obtaining medical attention for individuals who were shot by the suspect he was pursuing – which, if taken, may have prevented the shooting from occurring. (Katsaris Aff. ¶ 5.) Katsaris also criticizes FWPD for failing to complete an investigation into whether Ford actually fired a weapon that night. (Katsaris Aff. ¶ 6; Katsaris Dep. 41.) Gerardot seeks to exclude these opinions, arguing that they are not relevant to the individual capacity excessive force claim. (Mem. of Law 2, 14.)

As explained *supra*, "expert testimony on police practices and the use of force is, generally, admissible in a § 1983 excessive force case," *McCloughan*, 208 F.R.D. at 239 (citing

*Calusinski*, 24 F.3d at 937; *Kladis*, 823 F.2d at 1019), and there is no dispute that Katsaris has

the necessary qualifications to do so. Furthermore, there is little doubt that Katsaris's testimony

about proper police procedure, including proper procedure with respect to those events leading

up to the shooting, would be helpful to the jury in its task of determining whether Gerardot acted

reasonably in light of the facts and circumstances confronting him. *Id.*; *see also Bates*, 2007 WL

1412889, at *3 ("Expert testimony from an experienced law enforcement professional would

assist the jury in understanding whether a particular officer exerted excessive force."). 

Therefore, Katsaris will be allowed to opine about the proper police procedure to be employed in

a situation such as the one facing Gerardot on the night of the shooting.

Nonetheless, a post-shooting investigation is simply not relevant to the ultimate inquiry

here, that is, the "circumstances known and information available to the officer at the time of his

action (firing the fatal shot)." *Sherrod v. Berry*, 856 F.2d 802, 804-05 (7th Cir. 1988). In fact,

"[t]he reception of evidence or any information beyond that which [Gerardot] had and

reasonably believed at the time he fired his revolver is improper, irrelevant and prejudicial to the

determination of whether [he] acted reasonably 'under the circumstances.'" *Id.* ("When a jury

measures the objective reasonableness of an officer's action, it must stand in *his* shoes and judge

the reasonableness of his actions based upon the information he possessed and the judgment he

exercised in responding to that situation.").

Therefore, Gerardot's motion is DENIED to the extent it seeks to preclude Katsaris from

testifying about proper police procedure under the circumstances facing Gerardot on the night of

the shooting, but is GRANTED with respect to Katsaris's criticisms of FWPD's post-shooting

investigation.

D.  <u>Spitz's opinion that Ford's left arm may have been raised above his head at the time</u>
<u>of the shooting</u>

        In his affidavit, Spitz stated that Ford's "left arm is believed to have been raised when

struck." (Spitz Aff. ¶ 5.)  However, Spitz testified at his deposition that he cannot definitively

opine as to whether Ford's left arm was raised above shoulder level at the time of the shooting.[4]

(Spitz Dep. 31.)  Gerardot argues that since "Spitz cannot testify with any degree of reasonable

medical certainty *about the level* at which Ford may have had his hands raised," his opinion is

speculative and thus should be excluded. (Mem. of Law 16 (emphasis added).)

        Spitz explained that in reaching this conclusion he relied on photographs, the autopsy

report, and the description of the bullet wounds.  More particularly, Spitz opined that, more

likely than not, bullet wound number three (chest on left side of rib cage) was a re-entry of bullet

number one, which was a downward shot that went through Ford's arm and continued into his

chest. (Spitz Dep. 18-21.)  He further explained that Ford's arm would have been raised to a

point in line with the chest wound, as reflected by insertion of a probe through the bullet

---

        [4] More particularly, Spitz testified as follows:

        Q.      You say the left arm is believed to have been raised when struck.  And just to make sure I'm clear
                in understanding your opinion, your opinion is that the arm, the left arm, was raised to some
                extent,  and also forward to some extent, right, at the time of the impact with the bullet hitting the
                left arm?

                * * * *

                But you can't say how far, specific inches or centimeters, or anything like that?

        A.      No.

        Q.      But it wouldn't have been raised above the shoulder level?

        A.      If I cannot tell you . . . how little, I also cannot tell you how much.

(Spitz Dep. 31.)

wounds. (Spitz Dep. 24-26, 31-32.)  Specifically, Spitz stated:

> I indicated only that the arm was in such a position as to enable continuation of the wound track into the chest . . . .  I don't know how he raised his arms, or didn't raise his arms, or whatever he did.  But if he did raise his arms in the position like I'm showing you at the present time, he still would have his arms raised in a surrender position with the wound track from the left arm continuing into the let side of the chest.
>
> * * * *
>
> Yes, I agree that the hands were not above the head, but that doesn't mean that he didn't raise his arms.

(Spitz Dep. 66-67.)

Clearly, Spitz grounds his opinion that Ford's hands were in the air when he was shot in sufficient data and methodology and thus, contrary to Gerardot's suggestion, it is not speculative. *See, e.g.*, *McKinney v. Duplain*, No. 1:04-cv-294-RLY-TAB, 2007 WL 1128852 (S.D. Ind. Apr. 16, 2007) (admitting Spitz's testimony about bullet trajectories and the deceased's body position that was based autopsy report, photographs, deposition transcripts and videotapes, and other tangible evidence).  That Spitz cannot definitively opine about the precise level that Ford's arm was raised certainly does not render his testimony unreliable. *See generally id.* at *6 ("The fact that [the expert] expressed his opinion in terms of possibilities does not render his testimony inadmissible; rather, it goes to the weight of its testimony, not its admissibility.").  Therefore, Gerardot's motion to exclude this portion of Spitz's opinion is DENIED.

E.  Spitz's opinion that Ford was falling when he was shot

Similarly, Gerardot seeks to exclude Spitz's opinion based on the gun shot trajectory that Ford was falling at the time the shots were fired.  Gerardot rather conclusorily argues that since Spitz "admitted that he cannot provide specifics as to [t]his opinion," it is "based upon

15

speculation and not up a reasonable degree of medical or scientific certainty." (Mem. of Law 16.) Again, Gerardot's argument goes more toward the weight of Spitz's testimony, not its admissibility. *See, e.g.*, *McKinney*, 2007 WL 1128852, at *6; *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1119-20 (N.D. Ill. 2005) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility."). Spitz's knowledge and experience as a forensic pathologist certainly qualify him to opine about the position of Ford's body when he was shot, and his testimony is based upon sufficient facts or data, that is, photographs of the location, size, and shape of Ford's gunshot wounds, or "wound tracks," and the autopsy report. (*See* Spitz Dep. 35-37); *see, e.g.*, *McKinney*, 2007 WL 1128852, at *5-7. Furthermore, his opinion about Ford's physical position when he was shot based on his analysis of Ford's wounds is likely "to assist the trier of fact to understand the evidence . . . ." *Hall*, 93 F.3d at 1342.

Therefore, Gerardot's motion is DENIED with respect to Spitz's testimony that Ford was falling when he was shot.

F. <u>Spitz's opinion that Ford was not holding, aiming, or firing a gun when he was shot</u>

Gerardot also challenges Spitz's opinion that Ford was not holding, aiming, or firing a gun when he was shot, asserting that it is "[a]nother speculative opinion with no scientific basis." (Mem. of Law. 17.) More particularly, Gerardot contends that Spitz bases his opinion merely on witness statements and the fact that no gun was found near Ford's body. (Mem. of Law 17.)

Gerardot's characterization of Spitz's basis for his opinion is a bit narrow. While Spitz did articulate that he relied on witness statements and the fact that no gun was found near Ford's body, he *also* stated that he relied on the autopsy report to arrive at his conclusion.

Q.      And what about the nature of the locations and trajectories of the wound tracks would preclude the possibility that Derrick Ford was holding a handgun in his right hand?

A.      Well, the location of the wound tracks indicate . . . that the shots occurred in close proximity of each other.  One of them was - - or several of them were shots that would have made him fall.  There is no gun that was located.  There is no evidence on his hand that would suggest that he fired a gun.  There is really nothing in the circumstantial evidence either that he held a gun, or that he even owned a gun, or had a gun.

Q.      But that doesn't have anything to do with what the autopsy report shows, what you just talked about.  That is based on witness statements and other information, correct?

A.      Well, it's based on - - on the autopsy too, because the suggestion from the autopsy, from the wound tracks, is that he would have collapsed in close proximity to, for lack of more information at this time, from one or more of the shots that he was hit with.  Under those circumstances, any gun that he held, or fired, or aimed in his - - with his right hand would have been with the body.

        * * * *

Q.      But you're not saying, and it's not your opinion, Dr. Spitz, that - - that the physical findings in the autopsy report would have precluded Derrick Ford from having a handgun in his right hand at the time of the shooting?

A.      Well, I wouldn't say that.  If you have a weapon in a hand, and the person falls to the ground, you would expect that weapon to be there.  If that weapon was fired you would expect evidence on the hand that fired the gun, that there is gun powder residue on - - on the hand.  If you consider the location of the trajectories of these bullets, it seems that at some point he was upright with downward - - with downward shots, that in the course of the shooting he sustained additional gunshot wounds, which made him fall.  All shots occurred in close proximity to each other, and I still don't have any evidence of there being any material evidence of him having had a gun in his hand that he fired or didn't fire.

(Spitz Dep. 41-43.)

Because Spitz did rely, at least in part, on medical and scientific evidence, that is, the

autopsy report, for his conclusion that Ford did not have a gun, we think Gerardot's challenge

really goes more toward the weight of his testimony, not its admissibility. *See, e.g.*, *Loeffel Steel*

*Prods.,* 372 F. Supp. 2d at 1119-20.  Therefore, his motion to exclude this portion of Spitz's opinion is DENIED.

G.  Spitz's opinion that Ford experienced conscious pain and suffering prior to his death

Finally, Gerardot submits that Spitz should be precluded from offering any opinion that Ford suffered conscious pain and suffering prior to his death, arguing that it is "pure speculation." (Mem. of Law 18.)

On that score, Spitz stated at his deposition that Ford's gun shot wounds were not immediately fatal, estimating that Ford survived for five to six minutes after the shooting until he died from blood loss. (Spitz Dep. 47.)  Spitz further testified:

Q.      How long before [Ford] would have lost consciousness?

A.      Possibly three minutes.

* * * *

Q.      What do you base that opinion upon?

A.      On the fact that he knows he is not likely to get out of the situation alive, being fired at repeatedly, unable to move his lower extremities, and gradually losing strength.  And that - - not only strength, but after awhile getting in and out of consciousness, not consciousness so much as double vision, an ability to discern, ability to remain awake, all these things generate a sensation of impending doom. So that is the reason why I'm suggesting that he experienced physical pain and the fear of impending death.

Q.      And in . . . Derrick Ford's particular case, how do you arrive at the opinion that he has experienced those things in particular?

A.      Well, he has no injury of the . . . central nervous system above the shoulders, that means the brain.  He has no - - there is no reason anywhere to suggest that he was not able to formulate such . . . thoughts for the duration that he remained conscious.

Q.      So you believe he had the ability to generate those opinions or thoughts; is that what you're saying?

18

A.  I think anybody does.

Q.  Whether he did, you don't know?

A.  There is no reason . . . for me to think that Derrick Ford did not have the ability to formulate these opinions under the circumstances of this case.

Q.  Did you receive any information to indicate that he was conscious and spoke to anyone from the time he was shot until he died?

A.  I d[id] not . . . .

(Spitz Dep. 47-50.)

In support of his argument to exclude Spitz's testimony, Gerardot cites *Myers-Clark v. Frahler Elec. Co.*, No. C05-5553, 2007 WL 189248, at *3 (W.D. Wash. Jan. 22, 2007), in which the district court excluded Spitz's opinion that the defendant, who was electrocuted while employed as a maintenance worker at an assisted living facility, likely experienced 45 to 50 seconds of conscious pain and suffering before he died. The *Myers-Clark* court opined:

> The court has reviewed all furnished excerpts from Dr. Spitz's deposition regarding this issue, and finds his testimony somewhat mercurial. He only speaks of a reasonable medical certainty . . . when he says, "but I'm talking about a reasonable medical certainty considering that there is a period during which there is an arrhythmia and then they develop ventricular fibrillation." Having read the context in which that response was given, it is impossible for the court to determine to what extent, if any, the comment was made with regard to this particular incident. With regard to the duration of that period of time, the court finds nothing in the deposition that reaches the level of "reasonable medical certainty" with regard to the decedent in this matter.

*Id.*

Admittedly, Spitz could not definitively opine at his deposition that Ford experienced conscious pain and suffering, and there is no evidence that Ford was conscious at the scene after the shooting. *Cf. Sonnier*, 2007 WL 576655, at *2, 5 (allowing Spitz's testimony that the defendant experienced conscious pain and suffering where defendant did not seek to exclude it

19

and the defendant mouthed "I can't breathe" to officers at the scene). However, Spitz *did* render in his expert report to a "reasonable medical certainty" his opinion that Ford experienced conscious pain and suffering and the fear of impending doom for a short duration as a result of the gunshots. (Spitz Letter 2; Spitz Dep. 13.) In fact, Gerardot does not attempt to seriously dispute Spitz's qualifications to render such an opinion; as explained *supra*, Spitz's testimony is grounded in his education, training, and experience as a forensic pathologist and his review of the medical evidence in this case.

Furthermore, unlike his testimony in *Myers-Clark*, Spitz states *with particularity* why he thinks Ford may have experienced three minutes of conscious pain and suffering before he died. He explains that Ford had no injury to his central nervous system above the shoulders and that the gunshots were not immediately fatal, that is, Ford died of blood loss five to six minutes *after* the gunshots. (Spitz Dep. 47-50); *cf. Estate of Long ex rel. Smith v. Broadlawns Med. Ctr.*, 656 N.W.2d 71, 85-86 (Iowa 2002) (denying damages for conscious pain and suffering where expert testimony indicated that hemorrhaging from a gunshot wound to the chest indicated that the first gunshot was likely to decedent's head, which, at very least, rendered her immediately unconscious). There is no question that this testimony would assist the jury to understand the medical evidence surrounding the circumstances of Ford's death and whether it was physiologically possible for Ford to experience pain and suffering before he died. *See generally Hall*, 93 F.3d at 1342. And, there is no indication that the probative value of this testimony is substantially outweighed by any danger of prejudice to Gerardot or confusion to the jury. *See* Fed. R. Evid. 403.

Moreover, some district courts have admitted expert testimony that a decedent could

have experienced conscious pain and suffering prior to death even though there is no evidence establishing that decedent was, in fact, conscious. *See, e.g.*, *Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717, 725 (N.D. Ill. 2001) (allowing expert's testimony that decedent suffered ventricular fibrillation as a result of an electric current that passed through his heart and thus suffered a significant amount of pain and suffering before he died); *Potdevin v. Dorset Hotel Co.*, No. 87 Civ. 3603 (JFK), 1991 WL 12312, at *3 (S.D.N.Y. Jan. 30, 1991) (admitting forensic pathologist's opinion that decedent possibly experienced acute and excruciating pain, fear, and anguish after a blow to the head, though expert could not opine whether the first or second blow was the fatal one).

In fact, the Seventh Circuit Court of Appeals has held that Federal Rule of Evidence 702 does not require "that an expert's opinion testimony be expressed in terms of a reasonable scientific certainty in order to be admissible." *Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir. 1993) (quoting *United States v. Cyphers*, 553 F.2d 1064, 1072-73 (7th Cir. 1977)). Rather, the Seventh Circuit "adhere[s] to the rule that an expert's lack of absolute certainty goes to the weight of his testimony, not to its admissibility." *Id.* (quoting *Cyphers*, 553 F.2d at 1072-73); *see, e.g., McKinney*, 2007 WL 1128852, at *6. Indeed, "shaky expert testimony and testimony with a weak factual basis is better revealed through cross-examination and it is not an abuse of discretion to admit such testimony." *Traherne*, 156 F. Supp. 2d at 724 (citing *Daubert*, 509 U.S. at 596); *see Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000) ("The proper method of attacking evidence that is admissible but subject to doubt is to cross-examine vigorously, to present contrary evidence, and to give careful instructions on the burden of proof."); *Stutzman*, 997 F.2d at 296 (collecting cases on same); *Richman*, 415 F. Supp. 2d at 949

("[C]ross-examination and careful jury instructions, not exclusion of expert testimony, are the preferred methods of dealing with challenged expert testimony." (internal quotation marks omitted)).

Consequently, Gerardot's motion to exclude Spitz's opinion that Ford experienced conscious pain and suffering prior to his death is DENIED.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Exclude Opinions of Kenneth Katsaris and Werner Spitz, M.D. (Docket # 123) is GRANTED IN PART and DENIED IN PART with respect to Katsaris according to the terms set forth in this Opinion and Order, and is DENIED with respect to Spitz.

SO ORDERED.

Enter for the 23rd day of September, 2008.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge